IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **SHIRLEY HARRIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | 5:03CV432 (DF) |
| vs. | : | |
| | : | |
| **CHRISTOPHER TANNER, and** | : | |
| **the CITY OF TENNILLE, GEORGIA,** | : | |
| | : | |
| **Defendants.** | : | |

### O R D E R

Currently pending before the Court is a Motion for Summary Judgment (tab 13) filed by Defendant Christopher Tanner, a police officer with the Tennille, Georgia Police Department, and Defendant City of Tennille, Georgia. Plaintiff Shirley Harris sued Defendants pursuant to 42 U.S.C.A. §§ 1983 and 1988, alleging an excessive-force claim under the Fourth and Fourteenth Amendments and state-law claims for assault, battery, and malicious prosecution. After carefully considering the parties' arguments, the evidence, and the applicable law, the Court concludes that: (1) Tanner is entitled to qualified immunity on Harris's excessive-force claim; (2) Harris's § 1983 claim against the City fails as a matter of law; and (3) Harris's state-law claims against Tanner and the City are barred by official

immunity and sovereign immunity, respectively.

Accordingly, Defendants' motion for summary judgment is **GRANTED.**

I. **FACTS**

Many of the facts in this case are sharply disputed. But because the Court must credit the plaintiff's version of events in the qualified-immunity context, and because the case is before the Court on a motion for summary judgment, the facts will be recounted in the light most favorable to Harris.[1]

Sometime between 11:00 a.m. and 1:00 p.m. on December 28, 2001, three officers from the Tennille, Georgia Police Department pulled over a 1983 Oldsmobile Cutlass being driven by William Hagans. The traffic stop was organized as part of a controlled, undercover drug purchase, which was set up by the police department after officers had received information of Hagans's drug dealing. The purchase was made using marked U.S. currency.

Just before the traffic stop was initiated, Hagans was contacted by the undercover operative, who suggested that Hagans come pick him up. Hagans

---

[1] "When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury. When a district court considers the record in this light, it eliminates all issues of fact. Thus, [ ] material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment." *Robinson v. Arrugueta*, No. 04-10856, 2005 WL 1567306, at *4 (11th Cir. July 7, 2005). By eliminating all issues of fact, the Court is able to proceed directly to the legal questions presented by the two-part qualified-immunity analysis discussed below. *See Saucier v. Katz*, 533 U.S. 194 (2001).

2

showed up and the two drove onto Fargo Street.  When the time was right, three officers from the Tennille Police Department, who were parked nearby, closed in on the Oldsmobile from different directions.  The officers who arrived on the scene were Defendant Officer Christopher Tanner, Officer Richard Knowles, and Chief Joel Cochran.

After pulling Hagans over, the officers informed him about the undercover operation and began to search the car for drugs and for the marked currency. Tanner found green, leafy material in the back floorboard which he believed to be marijuana.  The marijuana was placed on top of one of the patrol cars, as was the marked currency, which was also found during the search.

While Tanner was still in the process of conducting the search, Hagans's girlfriend, Suferior Jordan, walked up to the scene and asked the officers and Hagans to tell her what was going on. Jordan learned of the situation after receiving a telephone call from her aunt.  The search was of particular concern to Jordan because Hagans had had a prior run in with local law enforcement officials[2] and because the 1983 Oldsmobile he was driving when he was stopped belonged to her.

---

[2] Hagans was driving Jordan's car when he was previously arrested for suspicion of drug possession.  Her car was impounded for several months.

Since the officers were engaged in an ongoing search, Chief Cochran told Jordan to back away from the unsecured scene. Tanner told her to leave and that he was tired of her interfering with their police work.[3] Jordan says that she backed up, all the while informing the officers that she knew her rights and therefore did not have to go anywhere. The officers again told her to back away, but Jordan persisted, maintaining that because it was her car that was being searched she intended to remain. In recounting the events of that day, Jordan noted that her refusal to leave the scene stemmed from her belief that she had a right to remain on the scene to make sure the officers did not plant evidence in her car.

Apparently curious about the traffic stop, approximately twenty individuals from the neighborhood had by this point begun to gather around the officers and the patrol cars. Everyone appears to agree that the situation was calm before Jordan arrived.

While standing in the midst of the search, Jordan began communicating with Hagans about calling an attorney and seeing to it that her car did not get impounded. Hagans was seated in one of the patrol cars, where he had been placed

---

[3] Tanner and Jordan had exchanged words when Hagans was arrested several months earlier.

while the officers looked through the car. At some point an argument broke out between Jordan and Tanner, and because the officers felt that Jordan was continuing to disobey their orders to back away from the scene, a decision was made to place her under arrest in an effort to restore some measure of calm.

Acting on Chief Cochran's request, Tanner moved toward Jordan, who testified that she was walking away from the scene toward a nearby apartment complex. As Tanner reached out to detain her she yelled at him several times "don't touch me." A physical struggle ensued. After a brief skirmish, Tanner and Officer Knowles wrestled Jordan to the ground and were in the process of trying to place her in handcuffs when she told Tanner to "get your fucking hands off me." As this was going on, her mother, Harris, showed up on the scene.

Harris, who had just driven up after running an errand, noticed that there were more cars on the street than usual and that a crowd had assembled. As she began running in the direction of the activity she noticed that her daughter was on the ground and that the officers were trying to arrest her. Harris was able to see that her daughter was flailing about in an attempt to avoid being handcuffed. Tanner was kneeling over Jordan trying to hold her hands together so Knowles could get her restrained. Harris walked past the onlookers and began telling the officers to let

5

go of her daughter. She told them that she could get Jordan under control if only the officers would let her escort Jordan to the patrol car. The officers continued their struggle with Jordan.

Harris then made her way up to the area where Jordan, Tanner, and Knowles were located and knelt down on the ground just behind Tanner. Harris then "gently" put her hands on his back. It was at this point, according to Harris, that Tanner backhanded her across the face. Harris then grabbed Tanner's arm and Tanner began slinging her around. During the struggle with Tanner, Harris indicates that she was struck in the face a second time.

Harris sustained a bruise and some swelling under her right eye and went to the doctor to seek medical treatment. She had an x-ray taken of her face, which revealed that she had no broken bones. Because she suffered only minor bruising, the doctor told her to keep compresses on it and did not prescribe any pain medication. Several days later she visited a second doctor who informed her that, other than discoloration, no damage had been done.

Harris filed this suit on December 29, 2003.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence. *See* **Anderson**, 477 U.S. at 249. Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions." **Avirgan v. Hull**, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III. DISCUSSION

### A. Section 1983 Claim Against Tanner

Section 1983 creates civil liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any

citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution." 42 U.S.C.A. § 1983 (West 2003). Harris asserts that Tanner, a police officer acting under the color of state law, violated a right guaranteed to her by the Constitution.

Specifically, Harris's § 1983 claim alleges that Tanner used excessive force against her when he struck her in the face while trying to arrest Jordan. The right to be free from excessive force at the hands of law enforcement officials is secured, in this context, by the Fourth Amendment. The conduct of which Harris complains occurred during the course of an arrest or seizure, as Tanner was attempting to restrain a combative arrestee. Consequently, to the extent that Harris's excessive-force claim is based on the Due Process Clause of the Fourteenth Amendment, it is dismissed. *See* **Graham v. Connor**, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").[4]

---

[4] Even if the Court were to analyze Harris's excessive-force claim under the Fourteenth Amendment, however, Tanner would be entitled to qualified immunity because he did not violate Harris's due-process rights; that Harris was struck in the face while interfering with Tanner's attempt to effectuate a lawful arrest is not shocking to the conscience. *See* **County of Sacramento v. Lewis**, 523 U.S. 833, 849 (1998) (noting that conscience-shocking conduct is that which is "intended to injure in some way unjustifiable by any government interest."); *see also* **Marier v. Town of Allenstown**, No. Civ. 01-398-JD, 2003 WL 22303075, at *6-7 (D. N.H. Oct. 8, 2003).

Tanner argues that he is entitled to qualified immunity with respect to Harris's Fourth Amendment claim.

### 1.     Qualified Immunity

More than simply an affirmative defense, qualified immunity is a freedom from suit that offers "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotations ommitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Id.* at 1194. Its protection extends to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As a threshold matter, before becoming eligible for qualified immunity, a government official must show that he was engaged in a "discretionary function" when he performed the act of which the plaintiff complains. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263-64 (11th Cir. 2004) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Here, it is undisputed that the search of the Oldsmobile and Tanner's subsequent actions in attempting to arrest Jordan were

9

discretionary functions; therefore, Tanner is entitled to assert the protection of qualified immunity.

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). To overcome the defense of qualified immunity, the plaintiff must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264; *see Conn v. Gabbert*, 526 U.S. 286, 290 (1999). In making this showing, the plaintiff must bear in mind that "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

The Court must evaluate the evidence in the light most favorable to the party asserting the injury. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second requirement comes into play only "[i]f a constitutional right would have been violated under the *plaintiff's* version of the facts." *Ferraro*, 284 F.3d at 1194; *see, e.g., Harris v. Coweta County, Ga.*, 406 F.3d 1307, 1313 (11th Cir. 2005) ("If, assuming the

plaintiff's allegations were true, no [constitutional] right would have been violated, the analysis is complete.").

### a. Constitutional Violation

The guarantees of the Fourth Amendment encompass the right to be free from excessive force in the context of a seizure or arrest. *See Graham*, 490 U.S. at 394; *see also Ferraro*, 284 F.3d at 1197. In evaluating whether an officer's use of force comports with the Fourth Amendment, the Court must determine "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Ferraro*, 284 F.3d at 1197. This determination requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

As the Eleventh Circuit has emphasized, "[t]he 'reasonableness' inquiry [ ] is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington* (11th Cir. 2004). Therefore, the inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

It is well settled that a law enforcement officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* The lawfulness of a particular application of force is context specific, inevitably varying from situation to situation. The Supreme Court in *Graham* explained the relevant considerations attending Fourth Amendment excessive-force claims, noting that the "objective reasonableness" standard:

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97 (internal citations omitted).

Mindful of these considerations, the Court—taking Harris's version of events as true—concludes that Tanner's use of force was objectively reasonable under the circumstances.

When Harris arrived on the scene, her daughter, Suferior, had already confronted the officers about the search of her car and the arrest of Hagans. The officers had warned her several times to back away from the immediate area because they were engaged in an ongoing search of the Oldsmobile. When she did not comply to the officers' satisfaction, Chief Cochran decided that the safest course of action would be to place her under arrest. When Tanner attempted to carry out Cochran's directive, Jordan became physically and verbally resistant. She informed the officers that they had no right to arrest her.

Tanner used physical force in getting her to the ground and then had to kneel on top of her to get her in a posture suitable for the application of handcuffs. As she continued to struggle, so too did Tanner and Knowles. This is how the scene appeared when Harris arrived. Concerned about her daughter, Harris ran up into the middle of an already escalating and turbulent situation, stooped down on the ground behind Tanner, and placed her hands on his shoulders. Even under Harris's own description of the events, it is clear that she interfered with the carrying out of a lawful arrest.

According to Harris, as soon as Tanner felt her hands on his shoulder, he responded by backhanding her in the face. To keep from falling, she then grabbed

13

onto the sleeves of his uniform, and he proceeded to sling her back and forth, trying to get her off of him. Harris testified that during the fracas she was struck in the face a second time. Meanwhile, Jordan—a resisting arrestee—remained lying on the ground. It is unclear whether she had been successfully handcuffed by this point.

The Court, taking Harris's version of events as true (*i.e.* that she knelt on the ground behind Tanner, "gently" placed her hands on his shoulder, and was backhanded twice in the face), cannot say that Tanner's behavior was objectively unreasonable under the facts and circumstances known to him at the time. Harris's claim that she was merely an innocent bystander is refuted by her own deposition testimony, which demonstrates that she in fact interfered with the attempted arrest.

Tanner was aware of the following circumstances at the time that he struck Harris: (1) the person he was trying to arrest was resisting in a physically and verbally combative manner; (2) he and his partner, Knowles, were having a difficult time bringing the arrestee under control; (3) a crowd of people was milling about watching the scenario play out; (4) events at the scene were unfolding rather quickly; (5) the officers on the scene were outnumbered by the neighborhood bystanders; and (6) the suspect of the investigation was sitting in the back of a patrol car. It almost goes without saying that the circumstances were "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.

The intrusion on Harris's Fourth Amendment interests was relatively minor: Tanner struck out at her causing her to suffer a temporary bruise that required no stitches, no bandaging, and no pain medication. Instead, she was told to treat her bruise by applying a compress. Under the circumstances, this intrusion is outweighed by the countervailing governmental interests facing Tanner, Knowles, and Cochran: the need to secure the scene of an ongoing vehicle search; the need to restrain the suspect's combative and resistant girlfriend; and the need to restore order to a tense and volatile situation. These important interests provided ample justification for the relatively minor use of force employed by Tanner.

Given the circumstances confronting Tanner and his fellow officers—Harris's interference with their efforts to arrest Jordan—it is evident to the Court that "a reasonable officer would believe that this level of force [was] necessary in the situation at hand." *Ferraro*, 284 F.3d at 1197. Thus, because Tanner acted in an objectively reasonable manner, he did not violate Harris's Fourth Amendment rights, and the Court need not address the "clearly established" prong of the *Saucier* inquiry. Tanner is entitled to qualified immunity on this claim.

### B. Section 1983 Claim Against the City of Tennille

Harris appears to assert a § 1983 claim against the City of Tennille for maintaining an official custom or policy, the following of which led to the violation of her constitutional rights. Harris argues that the City should be held liable for Tanner's actions because there is a "widespread practice of police abuse in the Tennille Police Department." Pl.'s Brief in Opp'n to Defs.' Mot. for Summ. J., tab 29, at 9. Even though this claim would fail as a matter of law for lack of evidence, its failure is guaranteed in this case because "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). The Court has concluded that Tanner's conduct did not violate any of Harris's constitutional rights. Thus, any inquiry into the customs or policies of the City is irrelevant, and the City is entitled to summary judgment on Harris's § 1983 claim.

### C. State-Law Claims Against Tanner

Harris has asserted claims against Tanner for assault, battery, and malicious prosecution. Tanner argues that such claims are barred by official immunity.

"Under Georgia law, a public officer may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to

injure." *Smith v. Chatham County*, 591 S.E.2d 388, 390 (Ga. Ct. App. 2003); *see also* *Williams v. Solomon*, 531 S.E.2d 734, 736 (Ga. Ct. App. 2000).  Stated differently, Tanner "may not be held liable for his discretionary acts unless such acts were wilful, wanton, or outside the scope of his authority."  *Delong v. Domenici*, 610 S.E.2d 695, 698 (Ga. Ct. App. 2005).  Here, Tanner, in attempting to arrest Jordan and secure the scene of the search, was acting in his discretionary capacity.  Therefore, he is shielded from liability unless Harris is able to show that his actions toward her were taken with malice or with an intent to injure.

Harris has offered no evidence indicating that Tanner acted maliciously or with an intent to injure her.  Instead, the only thing Harris offers on this issue is a statement in her brief that "Tanner's denial that he ever struck plaintiff . . . is itself evidence of [his] knowledge that he was violating plaintiff's constitutional rights." Pl.'s Brief in Resp. to Defs.' Mot. for Summ. J., tab 29, at 9.  This statement, besides its irrelevancy and its being wrenched out of context from the case upon which Harris relies,[5] is insufficient to overcome the official immunity to which Tanner, as a municipal police officer, is entitled.  Because Harris cannot demonstrate that Tanner acted with malice or an intent to injure, her state-law claims against him fail as a matter of law, and Tanner is entitled to summary judgment.

---

[5] *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered *substantive evidence* of the defendant's guilt.")

17

### D. State-Law Claims Against the City

To the extent that Harris attempts to hold the City vicariously liable for the torts allegedly committed by Tanner (assault, battery, and malicious prosecution), those claims too must fail as a matter of law. They are barred by the doctrine of sovereign immunity. "Under O.C.G.A. § 36-33-3, a municipal corporation is not liable for torts committed by its police officers while engaged in their official duties." *Williams*, 531 S.E.2d at 737. A city's sovereign immunity may be waived in limited circumstances, but the burden to prove such waiver rests with the plaintiff. *See Steele v. Ga. Dep't of Transp.*, 609 S.E.2d 715, 718 (Ga. Ct. App. 2005). Harris has failed to carry that burden. Consequently, the City is entitled to summary judgment to the extent that Harris alleges any state-law claims against it.

## IV. CONCLUSION

Plaintiffs have been bringing lawsuits under § 1983 for well over 100 years. The statute serves a useful purpose to punish law enforcement officers and other state actors by making possible an award in damages when the facts and the law justify such an award. There is no doubt in the mind of the Court that § 1983 cases are necessary for dealing with the occasional situation in which a police officer is abusive toward members of the public without cause or justification.

But this case should never have been brought.

It is clear from the facts of the case and the applicable law that Officer Tanner was attempting to make an arrest for which he was fully justified when Harris decided she had to butt in. The fact that Hagans was involved in the distribution of drugs in the community makes the bringing of this lawsuit all the more ill advised since the illegal distribution of drugs is such a plague in the African-American community.

Defendants' Motion for Summary Judgment is hereby **GRANTED.**

SO ORDERED, this 15th day of July, 2005.

/s/ **Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew